*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0085p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

ERICA BETTS et al.,

        *Plaintiffs-Appellees/
        Cross-Appellants,*

           *v.*

COSTCO WHOLESALE CORPORATION,

        *Defendant-Appellant/
        Cross-Appellee.*

Nos. 07-2103/2217

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-73435—Julian A. Cook, Jr., District Judge.

Argued: January 15, 2009

Decided and Filed: March 5, 2009

Before: KENNEDY, COLE, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Gerald L. Pauling II, SEYFARTH SHAW, Chicago, Illinois, for Appellant. Patricia L. Worrall, THE THURSWELL LAW FIRM, Southfield, Michigan, for Appellees. **ON BRIEF:** Gerald L. Pauling II, William F. Dugan, SEYFARTH SHAW, Chicago, Illinois, for Appellant. Patricia L. Worrall, Milton H. Greenman, THE THURSWELL LAW FIRM, Southfield, Michigan, for Appellees.

     GILMAN, J., delivered the opinion of the court, in which KENNEDY, J., joined. COLE, J. (pp. 20-23), delivered a separate opinion concurring in part and dissenting in part.

_____

## OPINION

_____

     RONALD LEE GILMAN, Circuit Judge. Six former employees sued Costco Wholesale Corporation, alleging that (1) they were terminated because they are black, and (2) that they were subjected to a racially hostile work environment in violation of Michigan

law. (No claim was premised on Title VII of the Civil Rights Act of 1964 or other federal cause of action.) After the district court denied Costco's motion for summary judgment, the case proceeded to trial. A deadlocked jury led to an initial mistrial, but a second jury unanimously found in favor of three of the six employees—Darrell Amour, Stephanie Lewis, and LaVearn Thomas—with respect to their hostile-work-environment claims. None of the six employees, however, prevailed on their claims of discriminatory termination. The second jury awarded lost wages to Amour, Lewis, and Thomas. Lewis and Thomas also received damages as compensation for their emotional distress.

Costco subsequently filed motions for judgment as a matter of law and to amend the jury's verdict. The district court denied the motion for judgment as a matter of law, which requested the court to vacate both the jury's finding of liability and the employees' emotional-distress awards. But the court granted Costco's motion to amend the jury's verdict by vacating the awards for lost wages.

Costco appeals the denial of its motion for judgment as a matter of law. Amour, Lewis, and Thomas cross-appeal the order vacating the lost-wages awards. For the reasons set forth below, we **REVERSE** the award of damages for emotional distress to Lewis and Thomas, **AFFIRM** the judgment of the district court in all other respects, and **REMAND** the case with instructions to award nominal damages to Amour, Lewis, and Thomas on their hostile-work-environment claims.

## I. BACKGROUND

### A.     Factual background

Costco sells name-brand merchandise at more than 400 warehouses nationwide, including a warehouse in Livonia, Michigan that is known as "Warehouse 390." Phil Sullivan became the manager of Warehouse 390 in July 2001. He allegedly created a work environment that was racially hostile to the Warehouse's black employees. The six black employees who filed suit are Darrell Amour, Nicola Barnes, Erica Betts, Stephanie Lewis, LaVearn Thomas, and Darrin Whitehead. Neither Barnes, Betts, nor Whitehead prevailed on any of their respective claims and are no longer involved in this case. Amour, Lewis, and Thomas, however, prevailed on their hostile-work-environment claims, alleging that Sullivan

repeatedly denigrated and devalued the black employees at Warehouse 390. Their testimony is summarized immediately below.

Amour was hired as a part-time Sales Auditor for Warehouse 390 in April 1998. He subsequently became a full-time employee, initially working as a Back-Up Payroll Administrator, and then as a Payroll Administrator. Sullivan offered Amour a management-level position—as Hard Lines Manager—but Amour declined the offer. During his time as Payroll Administrator, Amour socialized outside of work with Sullivan and developed a personal relationship with him. Amour nevertheless testified during trial that he was repeatedly subjected to racially derogatory remarks and behavior while employed at the Warehouse, including the following:

- Sullivan told Amour that he felt like he was working on a "plantation," which alluded to Costco's numerous black employees.

- Darrin Schaeffer, a white supervisor at the Warehouse, called Amour "Phil's Boy," "Phil's Bitch," and "Phil's Houseboy."

- Amour heard Sullivan say to white supervisors at the Warehouse that he (Sullivan) "wanted them to hire more white women with big breasts."

- Sullivan would treat white customers better than black ones.

- A white employee, Ann McCormick, had exactly the same number of employment infractions as another black employee who was reprimanded, but nothing was done to McCormick.

- Sullivan moved white employees to Front-End Cashier positions and relegated black employees to less desirable floor positions shortly after making the "plantation" comment.

Lewis also complained that Costco's atmosphere was a hostile one for black employees. She was hired by Costco in October 1999 as a Front-End Assistant. Lewis was promoted to the position of Front-End Cashier the following year, well before Sullivan became the Warehouse's manager. Her trial testimony included the following:

- Lewis overheard Sullivan say that he thought he was working on a plantation.

- Sullivan called Betts a "black-widow spider." Lewis heard the comment and believed that it was racist because there was no reason to call her "black," as opposed to simply calling her a spider.

- Sullivan called Betts "so black and ugly he would never have her work up front." (Lewis equivocated about whether she heard the comment first hand or learned about it from a coworker.)

Costco hired Thomas in March 1998 as a Front-End Assistant at the Warehouse. She was promoted to the position of full-time Front-End Cashier shortly thereafter, again well before Sullivan became the Warehouse's manager. Thomas was transferred to the Optical Department in October 2001, after Sullivan's arrival, where she worked as a full-time Service Assistant. The record does not indicate whether this was a promotion, demotion, or lateral move. Like Amour and Lewis, Thomas testified about Sullivan's demeaning behavior towards Costco's black employees. But despite the allegation of being subjected to a hostile work environment, Thomas said that she "wasn't harassed. Erica Betts was harassed." Thomas further alleged that:

- She witnessed Sullivan berate Betts to the point of tears. After the incident, Sullivan said "that girl just gets under my skin."

- Thomas went to a supervisor, Kenya Banks, to discuss a comment that Sullivan made about "hiring more white people."

- Sullivan's behavior made Thomas want to move from her position in the store.

- The environment was like "walking on egg shells" once Sullivan arrived at the warehouse.

Richard Webb, a Costco Vice President and Sullivan's direct supervisor, testified that he once heard Sullivan make a remark regarding the sale of watermelons at Costco. Although Webb believed that the comment simply expressed Sullivan's desire to stock more "high-end" merchandise at Warehouse 390 (as opposed to watermelons), Webb nonetheless considered the remark to be "racially insensitive" to black people. Even Sullivan conceded that fellow supervisor Narquita Stenhouse and another Costco employee believed that he (Sullivan) was a racist.

Amour and Thomas claim that they were among a number of Costco employees who reported Sullivan's behavior to their supervisors. One of those supervisors, Terry McDaniel, heard from Amour about Sullivan's demeaning remarks. McDaniel distanced herself from the comments, saying that she was "not that way," but did not otherwise opine about how she thought Sullivan treated black employees. The record does not indicate that Amour spoke to anyone with supervisory authority over Sullivan about the incidents.

As already mentioned, Thomas spoke to Banks, another supervisor who was subordinate to Sullivan, regarding Sullivan's desire to hire more white people. But Thomas did not contact Costco's corporate offices about her complaints because she said that other employees had already done so to no avail. Nor did Thomas speak to Vice President Webb, who had supervisory authority over Sullivan, because she believed that he and Sullivan were friends.

Lewis also testified that she did not bother to complain about Sullivan because others had already done so and had failed to spur any corrective action. Betts, however, testified that she complained to several supervisors about Sullivan's behavior, including McDaniel, Stenhouse, and Webb.

## B. Procedural background

This lawsuit was originally filed in state court, but was subsequently removed to federal court by Costco on the basis of the parties' diversity of citizenship. The jury trial began in late June 2006. Approximately one month later, the district court declared a mistrial because the jury was deadlocked. A new trial commenced in March 2007, and a unanimous verdict was entered roughly one month later. The second jury rejected all of the plaintiffs' discriminatory-discharge claims and the hostile-work-environment claims of Barnes, Betts, and Whitehead. Amour, Lewis, and Thomas prevailed, however, on their respective hostile-work-environment claims, and the jury awarded them lost wages in the amount of $9,320, $4,640, and $4,507 respectively. Lewis also received $15,000 for the emotional distress that she suffered, and Thomas obtained $10,000 for her emotional distress.

Costco subsequently filed motions under Rules 50(b) and 59(e) of the Federal Rules of Civil Procedure. The Rule 50(b) motion sought a judgment as a matter of law against

Amour, Lewis, and Thomas on the grounds that the evidence proffered at trial failed to support either the employees' hostile-work-environment claims or their entitlement to emotional-distress damages. As for the Rule 59(e) motion, Costco requested that the court vacate the lost wages awarded to the employees, arguing that they were not entitled to the damages because the jury had determined that they were lawfully terminated.

The court denied Costco's motion for judgment as a matter of law, but granted its motion to vacate the lost-wages awards. Costco timely appealed the court's denial of its motion for judgment as a matter of law. The three employees cross-appealed the court's order vacating the jury's award of lost wages.

## II. ANALYSIS

There are three issues on appeal. The first is whether the evidence was sufficient for the jury to find in favor of Amour, Lewis, and Thomas on their hostile-work-environment claims. Next is whether Lewis and Thomas introduced sufficient proof to entitle them to compensation for their emotional distress. Finally, Amour, Lewis and Thomas cross-appeal the district court's order vacating the jury's award for lost wages, arguing that Michigan law permits such a recovery. We will address these issues in the order listed after setting forth the applicable standards of review.

### A.     Standards of review

This appeal requires us to review a motion for judgment as a matter of law filed under Rule 50 of the Federal Rules of Civil Procedure. "In diversity cases, when a Rule 50 motion for judgment as a matter of law is based on a challenge to the sufficiency of the evidence, this Court applies the standard of review used by the courts of the state whose substantive law governs the action." *Kusens v. Pascal, Co.*, 448 F.3d 349, 360 (6th Cir. 2006).

"Michigan courts use the terms 'directed verdict' and 'judgment notwithstanding the verdict' rather than judgment as a matter of law." *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 894 n.3 (6th Cir. 1997). Orders granting a directed verdict are reviewed de novo by Michigan appellate courts, which also "view[] the evidence and all legitimate inferences in the light most favorable to the nonmoving party." *Elezovic v. Ford Motor Co.*, 697 N.W.2d

851, 857 (Mich. 2005). And a directed verdict may granted only if, after viewing all of the evidence in the light most favorable to the party opposing the directed verdict, reasonable minds could not differ on any question of material fact. *Caldwell v. Fox*, 231 N.W.2d 46, 49 (Mich. 1975).

This appeal also requires us to review a motion to alter or amend a judgment filed pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. "The grant or denial of a Rule 59(e) motion is within the informed discretion of the district court, reversible only for abuse." *Scotts Co. v. Central Garden & Pet Co.*, 403 F.3d 781, 788 (6th Cir. 2005) (citation and internal quotation marks omitted). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. 2004) (citations and internal quotation marks omitted).

Finally, the merits of this appeal are governed by Michigan law. But we are mindful that Michigan courts will examine federal cases for guidance in adjudicating Michigan civil rights claims. *See, e.g.*, *Downey v. Charlevoix County Bd. of Rd. Comm'rs*, 576 N.W.2d 712, 716 n.3 (Mich. Ct. App. 1998) ("Although federal precedence interpreting the federal Civil Rights Act is not binding on Michigan courts interpreting our own civil rights statutes, federal precedence can be used as a guidance by Michigan courts.") For the purposes of this appeal, the parties have not identified any material differences between Michigan employment-discrimination law under the Elliot-Larsen Civil Rights Act (ELCRA) and precedent arising under Title VII of the Civil Rights Act of 1964. Both parties, in fact, cite federal cases throughout their briefs. We will therefore rely on federal caselaw where such authority provides appropriate guidance.

**B.     Costco's motion for judgment as a matter of law**

Costco contends on appeal that the district court erred in denying its motion for judgment as a matter of law, in part because (1) the harassment suffered by Amour, Lewis, and Thomas was not sufficiently severe or pervasive to constitute a hostile work environment, and (2) Costco lacked adequate notice of their complaints. We will set forth the applicable legal framework before evaluating the merits of Costco's contentions.

### 1.      *Legal framework for hostile-work-environment claims*

A preliminary question exists about how to characterize the cause of action at issue in this case. Costco conflates the concept of "harassment" with "hostile work environment" in describing the employees' theory of liability. In the context of sexual-harassment cases, there is a difference between these terms because "harassment" refers to a broader category of claims that includes both hostile work environment and quid pro quo causes of action. *Elezovic v. Bennett*, 731 N.W.2d 452, 456 (Mich. Ct. App. 2007) ("There are two categories of sexual harassment: (1) quid pro quo and (2) hostile work environment.") We will therefore use the term "hostile work environment" to avoid confusion and because the Michigan courts do not employ the term "harassment" in formulating the elements of a hostile-work-environment claim brought under the ELCRA.

Establishing a prima facie case under a hostile-work-environment theory of discrimination requires plaintiffs to satisfy the following elements under Michigan law:

> (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of the protected status; (3) the employee was subjected to unwelcome conduct or communication on the basis of the protected status; (4) the unwelcome conduct or communication was intended to, or in fact did, interfere substantially with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.

*Downey*, 576 N.W.2d at 716. "[W]hether a hostile work environment existed shall be determined by whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Radtke v. Everett*, 501 N.W.2d 155, 167 (Mich. 1993). "Relevant circumstances 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mayville v. Ford Motor Co.*, No. 267552, 2006 WL 3040672, at *3 (Mich. Ct. App. Oct. 26, 2006) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). Importantly, the question of whether conduct is severe or pervasive is "quintessentially a question of fact." *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (citation omitted).

Stated in terms of the factors set forth above, Costco maintains that the employees failed to demonstrate a prima facie case because the conduct that they were subjected to was not sufficiently severe or pervasive to constitute a hostile work environment under Michigan's fourth element of a hostile-work-environment claim. *See Downey*, 576 N.W.2d at 716. Costco also asserts that the employees did not provide it with adequate notice of their complaints, which would have allowed Costco to remedy the situation, and that the employees therefore failed to satisfy the fifth element of their prima facie case. *Id.* We will address each argument in turn.

### 2.     *Intimidating, hostile, or offensive work environment*

Costco's lack-of-severity argument takes a divide-and-conquer approach to the employees' allegations. In other words, Costco insists that the individual allegations of Amour, Lewis, and Thomas must be examined in isolation in order to accurately assess the merits of each employee's claim. But Costco's approach is inconsistent with the totality-of-the-circumstances test employed to determine whether there is a hostile work environment. Under this test, "the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). Indeed, "[t]his court's caselaw therefore makes clear that the factfinder may consider similar acts of harassment of which a plaintiff becomes aware during the course of his or her employment, even if the harassing acts were directed at others or occurred outside of the plaintiff's presence." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 336 (6th Cir. 2008).

The caselaw of this court is admittedly not binding on the Michigan courts in their interpretation of the state's civil rights law. But Costco cites no authority holding that this court's totality-of-the-circumstances test is inapplicable to state claims brought under the ELCRA. And as we have already mentioned, Michigan courts look to federal law for guidance in the context of ELCRA-based claims. *See Downey*, 576 N.W.2d at 716 n.3. Amour, Lewis, and Thomas may therefore rely on each other's allegations to bolster their respective hostile-work-environment claims to the extent that they were aware of the underlying conduct during their employment at Warehouse 390.

Two conflicting scenarios regarding the racial atmosphere at Costco's Warehouse 390 emerge from the record. Under the first scenario, Sullivan's tendency to make racially insensitive remarks is indicative of poor taste and a bad sense of humor, but the remarks were not intended to create, nor in fact created, a hostile atmosphere for black employees. The incidents that the employees identified are few and far between: Amour's claim is based on nothing more than the six comments or actions set forth in Part II.A. above over a seven-month period. His claim of having been subjected to a hostile work environment is also at odds with the fact that Sullivan had offered Amour a management-level promotion, that Amour socialized outside of work with Sullivan, and that Amour developed a closer personal relationship with Sullivan than he had with other employees at the Warehouse. Lewis, in turn, testified to only the four points listed in Part II.A. above. And Thomas's claim was based on only two remarks. *See, e.g.*, *Clay v. United Parcel Serv.*, 501 F.3d 695, 707-08 (6th Cir. 2007) (holding that 15 incidents over a two-year time frame did not constitute severe or pervasive conduct). Thomas's claim is further undermined by her admission that she herself did not feel harassed. Indeed, there are even fewer statements relevant to determining whether there was a racially hostile work environment because several of the allegations are not inherently racial, such as Sullivan's comments that Betts "gets under [his] skin." Under this view, a reasonable jury could find that Sullivan's conduct did not "interfere substantially with the employee's employment or create an intimidating, hostile, or offensive work environment." *See Downey*, 576 N.W.2d at 716.

But there is a second scenario that also fits the facts. Several black employees voiced similar complaints about Sullivan's systematic racial bias. Sullivan compared Warehouse 390 to a plantation on two separate occasions. These comments reveal Sullivan's managerial philosophy with respect to his black employees: they were second-class citizens and would be treated accordingly. Indeed, Sullivan called one employee "so black and ugly he would never have her work up front," which expresses the belief that one's value as a cashier depends in part on the employee's skin color. Sullivan also chastised black employees but withheld criticism from white employees whose conduct was essentially the same, and moved white employees to front-end positions while relegating black employees to less desirable floor positions. He also wanted to hire more white women, implying that there were too many black women at Costco. If indeed Sullivan wanted more white employees,

one could reasonably infer that creating a hostile atmosphere for black employees to increase their turnover rate would serve this end. Even Sullivan conceded that two Costco employees thought that he was a racist, and one of Sullivan's superiors, Vice President Webb, had personally heard Sullivan make a racially inappropriate remark about watermelons.

Sullivan's position as the Warehouse Manager is also a relevant consideration. He was not simply a low-level supervisor with little impact on the broader workplace. As the Warehouse Manager, Sullivan set the tone at the top. Indeed, his racially charged attitude apparently caught on: at least one other white Costco supervisor, Schaeffer, denigrated Amour in racially loaded terms, calling him "Phil's Boy," "Phil's Bitch," and "Phil's Houseboy." The racial hostility was further evidenced not only by Sullivan's treatment of Costco's employees, but also by his less-than-favorable treatment of its black customers.

How one sorts out these two competing racial scenarios at Warehouse 390 is not obvious, as evidenced by the deadlock of the first jury. Certain facts make the employees' claims questionable. The fact that Sullivan socialized with Amour, that Amour was offered a managerial position by Sullivan, and that Thomas conceded she was not harassed lean in favor of Costco. On the other hand, none of these considerations foreclose the possibility that Sullivan "*in fact* . . . created an intimidating, hostile, or offensive work environment." *See Downey*, 576 N.W.2d at 716 (emphasis added).

Given that the question of whether the challenged conduct was severe or pervasive is "quintessentially a question of fact," *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (citation and internal quotation marks omitted), and after construing the aforementioned facts in the light most favorable to the employees, a jury could reasonably find in favor of the employees on this issue. The district court therefore did not err in declining to grant Costco's motion for a judgment as a matter of law on the basis that the complained-of conduct was insufficiently severe or pervasive to create a hostile work environment.

### 3.        *Respondeat superior*

We will now discuss the fifth and final element of the employees' prima facie case: respondeat superior.  Michigan law provides that "an employer may avoid liability if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment." *Radtke v. Everett*, 501 N.W.2d 155, 168 (Mich. 1993) (citation and internal quotation marks omitted).  Costco claims that the employees failed to establish their prima facie case because there is insufficient evidence that Costco had adequate notice of the hostile work environment that allegedly flourished under Sullivan's management.

To establish a prima facie case, an employee is generally required to present evidence that his or her employer had either actual or constrictive notice of the hostile work environment to establish a prima facie case.  *Sheridan v. Forest Hills Pub. Schs.*, 637 N.W.2d 536, 542 (Mich. Ct. App. 2001).  "Actual" notice requires a showing that the employee complained to an individual in "higher management," which is defined as a person who "possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the offensive employee." *Id.* at 542-43.  "Constructive" notice, on the other hand, requires "showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Id.* at 542.

Michigan courts have nevertheless explained that "when the hostile work environment is created by the actions of the employer, the alleged victim seeking a remedy under the [ELCRA] may file such a claim against her employer premised on a direct theory of liability." *Elezovic v. Bennett*, 731 N.W.2d 452, 457 (Mich. Ct. App. 2007).  In such cases, "the respondeat superior inquiry is unnecessary because holding an employer liable for personal actions is not unfair." *Id.* (quoting *Radtke*, 501 N.W.2d at 169).  In light of *Elezovic* and *Radtke*, the question arises as to whether Sullivan's position and conduct alone would suffice to render Costco liable under the ELCRA.

We need not decide the issue, however, because the record shows that at least one of Sullivan's superiors was in fact aware of the complaints raised by the black employees. During trial, Sullivan conceded that Vice President Webb, his direct superior, had received

telephone calls from one or more black employees who complained about Sullivan's behavior:

> Q [Counsel].   There were calls to Mr. Webb by African-American employees before the plaintiffs were terminated?
>
> A [Sullivan].  I am aware of at least one, maybe two, it could be more.
>
> . . .
>
> Q. You would agree with me that . . . Mr. Webb had a couple conversations with you about those calls with African-American[s] complaining about you?
>
> A.  I think you would be accurate on that, sir.

Webb also had first-hand knowledge of Sullivan's "watermelons" comment. Construing this evidence in the light most favorable to the employees, a reasonable jury could conclude that Webb, and therefore Costco, had actual notice of the hostile work environment that Sullivan had created.  The district court therefore did not err in upholding the jury's finding of hostile-work-environment liability against Costco and in favor of Amour, Lewis, and Thomas.

**C.        Lewis's and Thomas's compensation for their emotional distress**

As part of Costco's motion for judgment as a matter of law on the merits of the hostile-work-environment claims, Costco had sought to vacate the damages that were awarded to Lewis and Thomas to compensate them for their emotional distress.  Costco argues on appeal that these damages should be vacated because (1) to the extent there is any evidence of emotional distress, the evidence shows that the distress was caused by their respective lawful terminations, not from the hostile work environment itself, and (2) there is insufficient evidence to justify Lewis's and Thomas's awards as a matter of law.

Both Lewis and Thomas maintain that there is sufficient evidence in the record to uphold the jury's emotional-distress awards.  Lewis testified that she had numerous financial difficulties after she was terminated, including losing her medical and dental insurance and being evicted from her home.  Making matters worse, she suffered emotionally while trying to avoid living on the streets with her children, and had to rely on friends to provide her with temporary housing.

Thomas, on the other hand, testified that, before she left the warehouse, she was "upset" because she "felt something wasn't right." She was also "upset" and "disappointed" that she had lost her job. Thomas considered the racism that she had encountered "a smack in the face," asking rhetorically, "[h]ow many times are you going to smack me in the face before I stand up and make a stand?"

Costco's first argument is that none of the preceding testimony establishes that the emotional distress suffered by Lewis or Thomas "flow[ed] from" a violation of the ELCRA. *See Schafke v. Chrysler Corp.*, 383 N.W.2d 141, 143 (Mich. Ct. App. 1985) (holding that damages may be recovered for injuries or losses caused by each violation of the ELCRA). As to Lewis, Costco is clearly correct. There is no material evidence in the record regarding any emotional distress that Lewis suffered as a result of Costco's hostile work environment. Her distress flowed instead from the financial difficulties she faced after her nondiscriminatory discharge. Nor does Lewis provide any authority that would allow her to recover on the basis of emotional distress caused by her lawful termination. The district court therefore erred as a matter of law in upholding the jury's award compensating Lewis for her emotional distress.

Thomas, in contrast, provided generalized testimony about the distress that she suffered before she was terminated. She said that she was "upset" because she "felt something wasn't right," and that her treatment at Costco was a "smack in the face." The question regarding Thomas is therefore not whether at least part of her distress flowed from the hostile work environment, but instead whether her testimony was legally sufficient to justify emotional-distress damages.

Although medical evidence is not necessary in order for a plaintiff to be compensated for emotional distress, "damages for mental and emotional distress will not be presumed, and must be proven by 'competent evidence.'" *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996) (quoting *Carey v. Piphus*, 435 U.S. 247, 263-64 n.20 (1978)). "Michigan law allows recovery for mental anguish based on the plaintiff's own testimony; however, there must be 'specific and definite evidence of [a plaintiff's] mental anguish, anxiety or distress.'" *Moody v. Pepsi-Cola Metro. Bottling Co., Inc.*, 915 F.2d 201, 210 (6th Cir. 1990)

(quoting *Wiskotoni v. Mich. Nat'l Bank-West*, 716 F.2d 378, 389 (6th Cir. 1983) (applying Michigan law)).

Two cases are particularly instructive in resolving the sufficiency-of-the-evidence issue with respect to Thomas: *Erebia v. Chrysler Plastic Products Corporation*, 772 F.2d 1250 (6th Cir. 1985), and *Moore v. KUKA Welding Systems & Robot Corporation*, 171 F.3d 1073 (6th Cir. 1999). In *Erebia*, this court declined to set aside the jury's finding that the Mexican-American plaintiff had been subjected to a hostile work environment. 772 F.2d at 1258. As part of its verdict, the jury compensated Erebia for emotional distress that he had allegedly suffered during his employment. *Id.* at 1259. But this court concluded that there was insufficient evidence to sustain the jury's emotional-distress award, explaining that the

> plaintiff's only proof of emotional harm consisted of his statements that he was "highly upset" about the slurs and that "you can only take so much." His conduct in complaining to management on a regular basis also demonstrated a high level of concern.

*Id.* Erebia's emotional-distress damages award was thus vacated, and the case remanded to the district court with instructions to award him nominal damages to him as compensation. *Id.* at 1259-60.

In contrast to *Erebia*, the *Moore* court affirmed the district court's decision to uphold a jury award of $70,000 in damages to compensate the black plaintiff for the mental anguish that he had suffered during his employment in a racially hostile work environment. 171 F.3d at 1082-83. The plaintiff had testified that "he was 'angry' and 'upset' about the jokes and slurs and that he 'just couldn't take it anymore.'" *Id.* at 1081. But he also proffered further evidence of distress beyond this sparse testimony. In particular, he "complained to his supervisors and started looking for a new job," suffered through "a fairly steady stream of racial jokes and slurs during his employment," and was "intentionally isolated from coworkers in retaliation for filing an EEOC complaint." *Id.* at 1082-83. Indeed, the plaintiff eventually quit his job due largely to his inability to cope with the isolation. *Id.* at 1078.

We ultimately conclude that Thomas's evidence is more akin to that presented in *Erebia* than in *Moore*. Just as in *Erebia*, Thomas claimed to be upset, and made a statement comparable to "you can only take so much," testifying that she felt "smacked in the face." But Thomas's generalized comments are not sufficient to support an award for emotional

distress under *Erebia*. Nor did Thomas provide sufficient evidence of distress or specific testimony comparable to that which was proffered in *Moore*. The closest Thomas comes to providing "specific and definite evidence" of her emotional distress is the assertion that she moved to another position within Warehouse 390 to escape the hostile work environment that she had experienced as a front-end cashier. *See Moody*, 915 F.2d at 210 (citations and internal quotation marks omitted). This evidence, however, is severely undermined by Thomas's concession that she did not feel harassed. At best, Thomas's decision to change positions "demonstrated a high level of concern" about the racially hostile environment that she experienced as a front-end cashier. *See Erebia*, at 1259. As explained in *Erebia*, however, demonstrating a heightened concern about a racially hostile work environment is not enough to justify an award for emotional distress. *See id.* (holding that the plaintiff failed to provide sufficient evidence of emotional distress even though the plaintiff "demonstrated a high level of concern" by "complain[ing] to management on a regular basis"). The district court therefore erred as a matter of law in upholding the portion of the jury's verdict compensating Thomas for emotional distress.

Our dissenting colleague attempts to distinguish *Erebia* in two ways. First, the plaintiff in *Erebia* was subjected to racially hostile remarks by a subordinate. Sullivan, by contrast, was Thomas's superior. This purportedly makes a difference because "Sullivan was in a position that granted him greater power to affect the entire workplace with his racial animus." (Dissenting Op. p. 22) The dissent next points out that the plaintiff in *Erebia* was the only witness who testified in support of his hostile-work-environment claim, whereas several witnesses testified in this case. Having several witnesses, according to the dissent, shows that "Sullivan's racial hostility permeated the entire warehouse in a way that the comments in *Erebia* did not." *Id.* at 23.

But we fail to see how these distinctions make a difference in this case. The fact that Sullivan was a manager—even if his conduct indeed "more fully affected the workplace"—does not constitute "specific and definite evidence" of Thomas's emotional distress. *See Moody*, 915 F.2d at 210 (citations and internal quotation marks omitted). Sullivan's status as a manager is relevant to determining whether there was in fact a racially hostile work environment, but provides no information regarding *Thomas's* subjective state of mind.

Nor does the fact that several witnesses testified about the hostile work environment yield "specific and definite evidence" of Thomas's emotional distress. *See id.* Again, we acknowledge that the testimony provided by these witnesses supported her claim that there existed a racially hostile environment at Warehouse 390. But the witnesses were silent regarding Thomas's emotional distress.

On a final note, the dissent characterizes our disagreement as a dispute regarding "what constitutes evidence of mental or emotional distress." (Dissenting Op. p. 24). We think, however, that the issue is not what *constitutes* evidence of emotional distress, but rather what threshold amount of evidence is *sufficient* to sustain a claim of emotional distress as a matter of law. The dissent correctly notes that "the circumstances of a particular case" can be relevant to making a sufficiency determination. *See Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1994) (citation and internal quotation marks omitted). But in the course of highlighting the circumstances of Thomas's case, the dissent comes very close to implying that anyone who establishes a hostile-work-environment claim, and who has expressed concern about the hostility during the course of her employment, has provided sufficient proof to sustain an award for emotional distress. *Erebia* forecloses this conclusion. In sum, despite the evidence of a hostile work environment, we believe that Thomas simply failed as a matter of Michigan law to present sufficient "specific and definite evidence" of emotional distress. *See Moody*, 915 F.2d at 210.

**D.     Lost wages**

Based upon Costco's motion to alter or amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, the district court vacated the employees' award of lost wages. The employees argue on appeal that the court erred because (1) Michigan law permits recovery of lost wages for a hostile-work-environment claim even where those lost wages resulted from a lawful discharge, (2) the court impermissibly reweighed the evidence, and (3) the jury instructions allowed for such a recovery.

To grant a motion filed pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, there must be "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice."

*Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 496 (6th Cir. 2006).  The district court identified a clear error in the jury's award of lost wages under Michigan law.

Recovery of "damages for injury or loss caused by each violation of [the] act" is permitted under the ELCRA.  Mich. Comp. Laws § 37.2801.  Claims for damages under the ELCRA may thus include a loss of wages.  *Schafke v. Chrysler Corp.*, 383 N.W.2d 141, 143 (Mich. Ct. App. 1985).  But such damages must "flow from the violation [of the ELCRA]." *Id.*

Applying these standards, the district court analyzed the issue of lost wages as follows:

> In its evaluation of Costco'[s] motion, the Court concludes that damages, which are based on a loss of wage claim, do not naturally flow from a hostile work environment claim. In this case, a loss of wage award is not the natural consequence of the Plaintiffs' hostile work environment claims, in that the jury determined that Costco did not racially discriminate against them. Therefore, inasmuch as it was the judgment of the jury that Lewis, Amour and Thomas had been lawfully discharged, the Court must, and does, conclude that race was not a factor in Costco's decision to terminate them. The Court also notes that there were no allegations by the Plaintiffs that they missed work as a result of the hostile work environment at the Costco warehouse.  Since there is no evidence that the Plaintiffs missed time from work, it is illogical to conclude that they can recover for lost wages.

> Consequently, it would be erroneous for the Court to permit these three Plaintiffs to recover lost wages when their termination was deemed lawful. Since they were not wrongfully terminated, Costco has correctly identified a clear error of law in the jury's award for lost wages.  Accordingly, the jury award must be amended immediately to exclude the award of lost of wages to Lewis, Amour and Thomas.

In further support of its reasoning, the district court noted that several federal courts have adopted a similar analysis regarding the nonavailability of lost wages as damages in the context of a meritorious hostile-work-environment claim without a finding of wrongful termination.  *See, e.g.*, *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir. 2006) (holding that a hostile-work-environment claim alone in the absence of a successful constructive-discharge claim is insufficient to support an award for lost wages); *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1236-37 (10th Cir. 2000) (same).

The employees have not identified any authority, state or federal, that undermines the district court's reasoning. Nor is there any indication that the court usurped the jury's role by impermissibly reweighing the evidence. Finally, the jury instructions are irrelevant to the legal question of whether lost wages were appropriately awarded to Amour, Lewis, and Thomas.

In sum, we see no legal error or clearly erroneous finding of fact in the district court's decision to vacate the employees' awards for lost wages. The court therefore did not abuse its discretion in granting Costco's motion to amend the judgment with respect to these claims.

**E.     Summary**

We uphold the jury's finding that Amour, Lewis, and Thomas were subjected to a racially hostile work environment while employed at Warehouse 390 with Sullivan as the Warehouse's manager. But the three employees are not entitled to recover damages for lost wages (because they did not lose any wages as a consequence of the unlawful conduct attributable to Costco) or emotional distress (because the evidence was insufficient to support such an award).

On remand, the appropriate remedy in such a case—i.e., where the prevailing employees are not entitled to either lost wages or compensation for emotional distress—is redress in the form of nominal damages. *See Erebia*, 772 F.2d at 1259 (remanding with instructions to award nominal damages where the plaintiff prevailed on the merits of his hostile-work-environment claim but failed to provide sufficient evidence to warrant an award for emotional distress).

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the award of damages for emotional distress to Lewis and Thomas, **AFFIRM** the judgment of the district court in all other respects, and **REMAND** the case with instructions to award nominal damages to Amour, Lewis, and Thomas on their hostile-work-environment claims.

———————————————————————————

## CONCURRING IN PART AND DISSENTING IN PART
———————————————————————————

COLE, Circuit Judge, concurring in part and dissenting in part. The majority opinion reverses a jury award for emotional distress damages to LaVearn Thomas for insufficient evidence, despite competent evidence to the contrary. I believe the decision misreads our standard of review and this Court's precedent. Therefore, I respectfully dissent.

### A.     Standard of Review

Under Federal Rule of Civil Procedure 50, in diversity actions "this Court applies the standard of review used by the courts of the state whose law governs the action." *Kusens v. Pascal, Co.*, 448 F.3d 349, 360 (6th Cir. 2006). Rather than using the term "judgment as a matter of law," Michigan state courts use the terms "directed verdict" and "judgment notwithstanding the verdict" ("JNOV"). *Brocklehurst v. PPG Indus. Inc.*, 123 F.3d 890, 984 n.3 (6th Cir. 1997). Michigan courts review de novo a trial court's ruling for a directed verdict or JNOV. *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 857 (Mich. 2005). When conducting such review, "the evidence and all legitimate inferences [are viewed] in the light most favorable to the nonmoving party." *Sniecinski v. Blue Cross & Blue Shield*, 666 N.W.2d 186, 192 (Mich. 2003) (citations omitted). "A motion for directed verdict or JNOV should be granted *only* if the evidence viewed in this light fails to establish a claim as a matter of law." *Id.* (citations omitted) (emphasis added).

### B.     Evidence of Emotional Distress

Determining damages for mental and emotional distress is essentially subjective, though "an award of damages must be supported by competent evidence." *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978). "Michigan law allows recovery for mental anguish based on the plaintiff's own testimony; however, there must be specific and definite evidence of [a plaintiff's] mental anguish, anxiety or distress." *Moody v. Pepsi-Cola Metro. Bottling Co., Inc.*, 915 F.2d 201, 210 (6th Cir. 1990) (citations and internal quotations omitted). We have held that "a plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden" of proving that an employer's unlawful actions caused her emotional distress. *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir.

1996) (citing *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1119 (6th Cir. 1994)). Here, Thomas testified that, before she left the warehouse, she was "upset" and "disappointed," and that the racism she encountered from the warehouse manager, Phil Sullivan, was a "smack in the face." (Joint Appendix ("JA") 600.) She alleged that Sullivan's discriminatory behavior made her decide to transfer positions in the store. She also stated that the work environment was so toxic she felt like she was "walking on egg shells" when Sullivan was at the warehouse. (JA 597.)

## C.     Our Precedent

The majority states that two decisions instruct our resolution of this dispute: *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250 (6th Cir. 1985) (vacating emotional damages) and *Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073 (6th Cir. 1999) (affirming emotional damages). The majority determines that Thomas's evidence of emotional distress more closely resembles the evidence provided in *Erebia*, such that an award of emotional damages is inappropriate as a matter of law. (Majority Op. 16.) I believe that the majority's reliance on *Erebia* and its decision to vacate Thomas's emotional damage award are in error. *Erebia* is distinguishable in two ways. First, *Erebia* dealt with the "weakest of all" hostile work environment claims, *id*. at 1260-61 (J. Kennedy, dissenting), namely, emotional distress stemming from racial comments made by a subordinate. The dissent properly recognized that a subordinate's racial remarks are not comparable to racial remarks made by a supervisor, as "a supervisor can dominate the workplace with respect to his subordinate." *Id*. In this case, Sullivan was the warehouse manager and Thomas's superior, and therefore Sullivan was in a position that granted him greater power to affect the entire workplace with his racial animus.

Second, the plaintiff in *Erebia* testified on his own behalf and was his only witness. Here, multiple witnesses testified that Sullivan made racially offensive remarks that impacted all black employees. Five of Thomas's black colleagues testified to racially offensive comments made, or actions taken, by Sullivan. The jury found that racial hostility poisoned the work environment for three black employees. Thus, the evidence demonstrates that Sullivan's racial hostility permeated the entire Costco warehouse in a way that the comments in *Erebia* did not.

The majority opinion notes the fact that Sullivan was a manager and the testimony of "several witnesses" does not establish Thomas suffered emotional distress. (Majority Op. 16-17.) This is true. It is also true that the absence of such evidence would not prevent a plaintiff from establishing distress. However, these "circumstances of a particular case" bolster Thomas's testimony that the atmosphere at Warehouse 390 was racially charged, and caused her emotional distress. *See Turic*, 85 F.3d at 1215.

I believe that this case more closely resembles our decision in *Moore*, where we upheld a jury award of $70,000 to compensate a black plaintiff for emotional distress caused by a hostile work environment. *Moore*, 171 F.3d at 1082-83. There, the plaintiff testified that "he was 'angry' and 'upset' about the jokes and slurs and that he 'just couldn't take it any more'" *Id*. Based on this, we concluded that, "[a]ccepting plaintiff's narration of the facts as true, [the] evidence sufficiently demonstrates the requisite injury to support compensatory damages." *Id*. at 1082. Similarly, the plaintiff testified that, like Thomas, his superior was aware of the harassment.

The majority also notes that the racial comments in *Moore* were made with greater regularity and that the plaintiff felt he was isolated as a result of his filing of an Equal Employment Opportunity Commission claim. (Majority Op. 16.) This, in effect, concedes that the surrounding "circumstances of a particular case" are relevant to a showing of distress. But a plaintiff need only show that she suffered emotional distress. The frequency of racial harassment and the various ways in which it impacts a plaintiff may affect the size of an award, but such factors should not preclude an award. In *Moore*, the plaintiff may arguably have faced more pervasive harassment. Thus, plaintiff was awarded $70,000 in compensatory damages. Here, Thomas was awarded only $10,000 for her emotional distress. No matter the amount of the award, the evidence is unmistakably clear that Thomas was upset by the racial discrimination in her workplace, especially given that we view the evidence and all inferences in a light most favorable to her, as we must do. *Sniecinski*, 666 N.W.2d at 192.

**D.      Emotional Distress**

Much of my disagreement with the majority opinion comes from a fundamental difference over what constitutes evidence of mental or emotional distress.   As this Court found in *Moore*, evidence of mental anguish, anxiety, or distress includes being upset and disappointed with the hostile environment in which one works. *Moore*, 171 F.3d at 1082-83. And if anything, a specific and definite example of one's anguish, anxiety, or distress would be Thomas's decision to change positions at Costco to escape such an environment.

Finally, the majority argues that Thomas's claims are undermined by her admission that she was not the target of harassment. (Majority Op. 16.)  But this is not supported by Michigan hostile-work-environment cases nor does it comport with this Court's concept of emotional distress.  Rather, Michigan law provides for compensation for individuals who have suffered emotional distress from a racially hostile environment regardless of the identity of the harassee.  This is so because the victims of racially hostile work environments, as conceded by the majority, are not only the direct targets of harassment but all those employees whose work environment is affected.

**E.      Conclusion**

The testimony in this case satisfies the evidentiary requirements for an the award of emotional distress damages to Thomas.  For the reasons set forth above, I dissent from the majority opinion reversing the award of damages for emotional distress to Thomas.  I concur with the majority opinion in all other respects.