HELENE N. WHITE, Circuit Judge,
concurring in part and dissenting in part.
I agree that Williams’s gender-based hostile-work-environment claim was improperly dismissed before trial for failure to exhaust administrative remedies.
As to Williams’s race-based hostile-work-environment claim, I do not agree with my colleagues’ affirmance of the district court’s grant of judgment as a matter of law and therefore respectfully dissent.
“Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult.” Hawkins v. Anheuser-Busch Inc., 517 F.3d 321, 332-33 (6th Cir.2008) (quoting Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). To prove harassment, the workplace must be “permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.” Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an envi *515 ronment that a reasonable person would find hostile or abusive — is beyond Title VII’s purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim’s employment, and there is no Title VII violation.
Williams v. Gen. Motors Corp., 187 F.3d 553, 566 (6th Cir.1999) (quoting Harris, 510 U.S. at 21-22, 114 S.Ct. 367). This evaluation of the work environment “must take into account the totality of the circumstances. ‘[E]ven where individual instances of ... harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation.’ ” Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 273 (6th Cir.2009) (quoting Williams, 187 F.3d at 563).
The district court acknowledged that it had to look to the totality of the circumstances in evaluating CSX’s motion for judgment as a matter of law on Williams’s race-based hostile environment claim. But its ruling from the bench suggests that it separated the conduct that was not overtly race-based (e.g., making Williams clean feces from the bathroom walls on several occasions, and urine all over the bathroom on a continual basis) from Wingo’s blatantly race-based comments,[1] rather than looking to, as the Supreme Court held in Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), “the critical issue” per Title VII’s text — “whether members of one [race] are exposed to disadvantageous terms or conditions of employment to which members of the other [race] are not exposed.” Id. (quoting Harris, 510 U.S. at 25, 114 S.Ct. 367 (Ginsburg, J., concurring)).
Substantial trial testimony supported that Williams was exposed to disadvantageous conditions of employment to which white clerks were not exposed. For example, Railroad Engineer Melvin Brack testified that he had worked for CSX for 34 years, and had been at the Bruceton depot approximately one to four times a week for the last 12 years, since 1997. Brack testified that after arriving at Bruceton, he would put his train away and go to the depot (where Williams worked) to register as off-duty and wait for a ride to a hotel, i.e., that he would “camp out” at the depot. Brack testified that typically two employees were working at the Bruceton depot, a yardmaster and a clerk. He described the depot as having three offices in the upstairs, and the downstairs as having a general locker room, sitting area for the crews and a bathroom. Brack testified:
BY MR. GILBERT:
Q Mr. Brack ... We were talking about the bathroom conditions, and I want to ask you some questions now about once Ms. Williams was hired; okay? In other words, once she is in place as a clerk.... Did you have the opportunity to observe the general conditions of the bathroom once she was hired?
A Yes, I did.
*516 Q Would you describe that for the jury, please.
A The bathrooms had always been somewhat—
MS. GALLAGHER: Objection, Your Honor.
BY MR. GILBERT:
Q If you would, instead of going back, let’s stick with what you observed once Ms. Williams was there; okay?
A The bathrooms after Ms. Williams was there became filthy, completely unusable. There was feces placed on the wall, over the urinals, over the commode, on the floor, on the sinks. I personally helped Ms. Williams clean the area because it was so gross. I didn’t think it was right for her to have to be given those responsibilities to do.
Q Let me ask you some questions about this urine. And I’m not trying to be funny here, but what if someone said it was just bad aim, someone just missed the urinal or just missed the toilets?
A Impossible.
Q Why?
A Because of the magnitude, where it was. There’s a difference between just normal use of someone with perhaps an upset stomach for the use of the commode versus all on the wall, on the side of it, on the sink and on the walls and floor.
Q How many times would you say you saw urine on the walls, sinks or floors, the urine?
A The urine was regularly.
Q And what does regularly mean in terms of—
A Meaning daily. The times when I was there, most of the — most times the urine was on the floor. And, again, impossible that someone could accidentally do such an act.
MR. GILBERT: I pass the witness, Your Honor.
CROSS-EXAMINATION
BY MS. GALLAGHER:
Q And I understand that it’s your testimony that on more than one occasion you saw the restroom in this condition; is that correct?
A Correct.
Q You never filed a grievance with your union to complain about this restroom.
A You must remember, in 34 years of railroad experience, I’ve seen the bathrooms in the worst deteriorated conditions over the 34 years where the railroad did not care about a bathroom. I’ve seen them go weeks and weeks without having been cleaned. So because of the length of time, it was acceptable — I assume the railroad thought it was acceptable. But to a point where there was feces and urine on the walls and everything, that was just too much.
[Emphasis added.] Craig Spangler testified that he had been a CSX conductor since 1998 and had worked with Williams at the Bruceton depot. Spangler testified that when Williams was working the bathrooms were clean and the trash taken out, and when she was not working “Trash would be laying around on the tables. Garbage cans would be full. A couple of times I’ve walked in the bathroom and you could tell that somebody had used the floor instead of using the commode.” When asked if he thought that was an accident, he responded “It looked like it was intentional. I mean you can tell when somebody misses.”
*517 Williams testified that the urinating all over the bathroom happened on a continual basis, and that she was required to clean feces in the Bruceton depot downstairs bathroom on two occasions, which she described:
Q Ms. Williams ... Was there any time when you were required to clean up feces?
A I had come to work one day, and someone had decided that they were going to do in the urinal what needed to be done in the toilet, and it was feces all in the urinal there in the bathroom, and I had to clean that up that day. I reported that to Mr. Anderson, and his response was, “Well, you know we work with immature people. You just need to get it cleaned up.”
Q Was there a separate occasion other than the time that the feces was in the urinal that you had to clean up?
A Yes.
That occasion, a trainman by the name of Mr. Brack happened to be on duty there at Bruceton, and he saw the condition of the bathroom, what it was in, and he went — he told me that he was going to help me clean it ...
There was feces spread around the wall, smeared over the wall. It was coming down the toilet, the outside of the toilet. It was on the floor.
In Betts v. Costco Wholesale Corp., 558 F.3d 461, 466 (6th Cir.2009) (applying Michigan law), the defendant-employer appealed the district court’s denial of its motion for judgment as a matter of law following a jury verdict in favor of three of the plaintiffs on their race-based hostile-work-environment claims. The defendant-employer in Betts argued on appeal that the harassment was not sufficiently severe or pervasive to constitute a hostile work environment, id. at 466-67, just as CSX successfully argued below in the instant case. Addressing whether the evidence was sufficient for the jury to find in favor of the three plaintiffs on their hostile-work-environment claims, this court stated:
Costco’s lack-of-severity argument takes a divide-and-conquer approach to the employees’ allegations. In other words, Costco insists that the individual allegations of [the three plaintiffs, Amour, Lewis, and Betts] must be examined in isolation in order to accurately assess the merits of each employee’s claim. But Costco’s approach is inconsistent with the totality-of-the circumstances test employed to determine whether there is a hostile work environment. Under this test, “the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether — taken together — the reported incidents make out such a case.” Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir.1999). Indeed, “[t]his court’s caselaw therefore makes clear that the factfinder may consider similar acts of harassment of which a plaintiff becomes aware during the course of his or her employment, even if the harassing acts were directed at others or occurred outside of the plaintiffs presence.” Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 336 (6th Cir. 2008).
Two conflicting scenarios regarding the racial atmosphere at Costco’s Warehouse 390 emerge from the record. Under the first scenario, [Warehouse 390 Manager Phil] Sullivan’s tendency to *518 make racially insensitive remarks is indicative of poor taste and a bad sense of humor, but the remarks were not intended to create, nor in fact created, a hostile atmosphere for black employees. The incidents that the employees identified are few and far between: Amour’s claim is based on nothing more than the six comments or actions set forth in Part II.A. above[2] over a seven-month period. Lewis, in turn, testified to only the four points listed in Part II.A. above.[3] And Thomas’s claim was based on only two remarks [Thomas witnessed Sullivan berate Betts, another black employee, to the point of tears, after which Sullivan said, “that girl gets under my skin;” Thomas went to a supervisor to discuss a comment Sullivan made about “hiring more white people;” Sullivan’s behavior made Thomas want to move from her position in the store; and the environment once Sullivan arrived at the warehouse was like “walking on egg shells.”] See, e.g., Clay v. United Parcel Serv., 501 F.3d 695, 707-08 (6th Cir.2007) (holding that 15 incidents over a two-year time frame did not constitute severe or pervasive conduct). Thomas’s claim is further undermined by her admission that she herself did not feel harassed. Indeed, there are even fewer statements relevant to determining whether there was a racially hostile work environment because several of the allegations are not inherently racial, such as Sullivan’s comments that Betts “gets under [his] skin.” Under this view, a reasonable jury could find that Sullivan’s conduct did not “interfere substantially with the employee’s employment or create an intimidating, hostile, or offensive work environment.” See Downey [v. Charlevoix Cnty. Bd. of Rd. Comm’rs, 227 Mich.App. 621, 576 N.W.2d 712, 716 (1998).]
But there is a second scenario that also fits the facts. Several black employees voiced similar complaints about Sullivan’s systematic racial bias. Sullivan compared Warehouse 390 to a plantation on two separate occasions. These comments reveal Sullivan’s managerial philosophy with respect to his black employees: they were second-class citizens and would be treated accordingly. Indeed, Sullivan called one employee “so black and ugly he would never have her work up front,” which expresses the be *519 lief that one’s value as a cashier depends in part on the employee’s skin color. Sullivan also chastised black employees but withheld criticism from white employees whose conduct was essentially the same, and moved white employees to front-end positions while relegating black employees to less desirable floor positions. He also wanted to hire more white women, implying that there were too many black women at Costco. If indeed Sullivan wanted more white employees, one could reasonably infer that creating a hostile atmosphere for black employees to increase their turnover rate would serve this end. Even Sullivan conceded that two Costco employees thought that he was a racist, and one of Sullivan’s superiors, Vice President Webb, had personally heard Sullivan make a racially inappropriate remark about watermelons.
Sullivan’s position as the Warehouse Manager is also a relevant consideration. He was not simply a low-level supervisor with little impact on the broader workplace. As the Warehouse Manager, Sullivan set the tone at the top. Indeed, his racially charged attitude apparently caught on: at least one other white Costco supervisor, Schaeffer, denigrated Amour in racially loaded terms, calling him “Phil’s Boy,” “Phil’s Bitch,” and “Phil’s Houseboy.” The racial hostility was further evidenced not only by Sullivan’s treatment of Costco’s employees, but also by his less-than-favorable treatment of its black customers.
How one sorts out these two competing racial scenarios at Warehouse 390 is not obvious, as evidenced by the deadlock of the first jury. Certain facts make the employees’ claims questionable. The fact that Sullivan socialized with Amour, that Amour was offered a managerial position by Sullivan, and that Thomas conceded she was not harassed lean in favor of Costco. On the other hand, none of these considerations foreclose the possibility that Sullivan “in fact ... created an intimidating, hostile, or offensive work environment.” See Downey, 576 N.W.2d at 716 (emphasis added).
Betts, 558 F.3d at 468-70. Granted, Betts amalgamates the evidence from each of the plaintiffs to arrive at the determination that there was sufficient evidence to go to the jury on the race-based hostile environment claim. But Williams’s evidence in the instant case is at least comparable to the plaintiffs’ in Betts in terms of severity, and the cases are similar in that the challenged comments were few.
As in Betts, in the instant case, under the totality-of-the circumstances test, there are also two conflicting scenarios. The first is that Wingo, with whom Williams had worked for approximately 2lk years largely without incident, made inappropriate remarks at the Bruceton depot on September 2, 2004, and that a lively discussion ensued that continued the following day. Apart from that, Wingo made several remarks over the 2}é years, i.e., that Williams reminded him of Queen Latifah, that black persons should give their children easily-pronounced names, and that if Williams felt that black persons were treated so badly, they needed to go back to where they came from.
The second scenario is that Williams, the only black employee working at the Bruce-ton depot had the same janitorial duties as her white-clerk counterparts but, unlike them, was made to clean human feces off the bathroom walls on several occasions, and to clean on a continual basis urine outside the urinal and sink, leading one trial witness to remark that in his 34 years at CSX he had never seen such conditions. When Williams raised the bathroom condi *520 tions to a supervisor, she was told that “you know we work with immature people.” Craig Spangler, another CSX employee that worked with Williams at the Bruceton depot, testified that when Williams was working the bathrooms were clean and the trash taken out, and when she was not working “Trash would be laying around on the tables. Garbage cans would be full. A couple of times I’ve walked in the bathroom and you could tell that somebody had used the floor instead of using the commode.”
A reasonable fact-finder could thus have inferred that Williams’s white counterparts were not made to fulfill their janitorial duties, while she was, regardless of how extreme and unsanitary the conditions were. Under Oncale, the jury was permitted to infer from this evidence that Williams was treated differently than her white counterparts because of her race. This inference, in conjunction with the evidence of Wingo’s blatantly race-based comments on September 2d and 3d, 2004, and on other occasions, rendered the district court’s grant of judgment as a matter of law improper. The claim should have been submitted to the jury.
I would reverse the district court’s grant of judgment as a matter of law to CSX on Williams’s race-based hostile-work-environment claim and remand for further proceedings.

. After hearing argument from counsel and discussing the evidence, the district court ended by saying:
Again, the court simply finds that the conduct by Mr. Wingo, as reprehensible as it might have been, was not a continuing type of conduct, as I determine. I recognize that there were some other instances that occurred, according to the plaintiff, but I simply do not find as a matter of law that these constituted a hostile work environment. I simply don’t believe, based upon what I have heard from the testimony presented, that it constituted that....
Trial Tr. 4/2/09 at 802.

2. This court summarized:
Sullivan told Amour that he felt like he was working on a "plantation,” which alluded to Costco’s numerous black employees.
Darrin Schaeffer, a white supervisor at the Warehouse, called Amour "Phil’s Boy,” “Phil’s Bitch,” and "Phil’s Houseboy.”
Amour heard Sullivan say to white supervisors at the Warehouse that he (Sullivan) “wanted them to hire more white women with big breasts.”
Sullivan would treat white customers better than black ones.
A white employee, Ann McCormick, had exactly the same number of employment infractions as another black employee who was reprimanded, but nothing was done to McCormick.
Sullivan moved white employees to Front-End Cashier positions and relegated black employees to less desirable floor positions shortly after making the "plantation” comment.
Betts, 558 F.3d at 464-65.

3. Pertaining to Lewis, Betts states:
Lewis overheard Sullivan say that he thought he was working on a plantation. Sullivan called Betts a "black-widow spider.” Lewis heard the comment and believed that it was racist because there was no reason to call her "black,” as opposed to simply calling her a spider.
Sullivan called Betts "so black and ugly he would never have her work up front.” (Lewis equivocated about whether she heard the comment first hand or learned about it from a coworker.)
Betts, 558 F.3d at 465.