RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0165p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

STEPHANIE WILLIAMS,

        *Plaintiff-Appellant,*

    *v.*

    No. 09-5564

CSX TRANSPORTATION COMPANY, INC.,

        *Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 05-01317—J. Daniel Breen, District Judge.

Argued: January 13, 2011

Decided and Filed: June 28, 2011

Before: MERRITT, ROGERS, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Justin S. Gilbert, GILBERT, RUSSELL, McWHERTER PLC, Jackson, Tennessee, for Appellant. Christopher W. Cardwell, GULLETT, SANFORD, ROBINSON & MARTIN, PLLC, Nashville, Tennessee, for Appellee. **ON BRIEF:** Justin S. Gilbert, GILBERT, RUSSELL, McWHERTER PLC, Jackson, Tennessee, Gregory G. Paul, MORGAN & PAUL, PLLC, Sewickley, Pennsylvania, for Appellant. Christopher W. Cardwell, Mary Taylor Gallagher, GULLETT, SANFORD, ROBINSON & MARTIN, PLLC, Nashville, Tennessee, for Appellee.

      MERRITT, J., delivered the opinion of the court. ROGERS (pp. 16–17), and WHITE (pp. 18–26), JJ., delivered separate opinions concurring in part and dissenting in part.

———————————

**OPINION**

———————————

MERRITT, Circuit Judge.   Plaintiff, Stephanie Williams, sued her employer, CSX Transportation Company, Inc. ("CSX"), for allegedly subjecting her to both racially and sexually hostile work environments.  The district court held that Williams failed to file a document that meets the test for a "charge" with the Equal Employment Opportunity Commission on her claim of a *sexually* hostile work environment and, thus, failed to exhaust her administrative remedies.  For that reason, the district court granted summary judgment to CSX on that claim.  We disagree and reverse.  As for Williams's *racially* hostile work environment claim, the district court granted judgment as a matter of law to CSX at the close of Williams's case in chief.  The district court reasoned that her evidence of a racially hostile work environment was not sufficiently "severe" or "pervasive" to create a jury question.  On that claim, and on a collateral evidentiary issue, we affirm.

### I.  Facts and Procedural Background

Stephanie Williams began working as a clerk for CSX at its Bruceton, Tennessee, facility in April 2002.  CSX operates railroad lines.  Clerks' duties include, among other things, performing janitorial work.  CSX's Bruceton facility was small; there were four clerks, including Williams, and a few supervisors.  Conductors and engineers would also pass through the Bruceton facility on a regular basis.  Among her coworkers and supervisors at the Bruceton facility, Williams was the only black employee and the only female employee.

Williams alleges that, between 2002 and 2004, her supervisors treated her differently than her white male counterparts.  First, she asserts that Ed Anderson, a supervisor, required her once to clean feces off the walls of a restroom and out of a urinal, and that her white male counterparts never had to complete such a task.  Second, Williams alleges that Anderson ordered her on four separate occasions to strip the

restroom floor using an inappropriate tool. Williams requested a power tool from Anderson, who told her it was not in the budget. A different supervisor, Tim Magargle, once permitted a white male clerk to rent a power tool to complete the same task. Third, Williams alleges that Anderson refused to reimburse her for the mileage expense of driving her personal vehicle twice weekly during 2003 from Bruceton to New Johnsonville, Tennessee — even though corporate policy was to reimburse such mileage and the white male employees in her office received reimbursement. Fourth, Williams asserts that her car was vandalized: the right exterior was "keyed," and the tires on the same wheel were punctured five successive times, resulting in five flat tires.

In addition to these incidents, Williams alleges that a single racist and sexist confrontation occurred at the CSX Bruceton facility. According to Williams, Jeff Wingo and Tim Magargle, two supervisors, were watching the Republican National Convention on television on the evening of September 2, 2004 when Williams entered and indicated she did not want to watch. Wingo allegedly told Williams that she was a Democrat only because she was a black woman; that unmarried women cannot "have the love of God in their heart[s]"; and that this country should "get rid of" Jesse Jackson and Al Sharpton because without those two "monkeys" the country "would be a whole lot better." The following day, Williams alleges that Wingo told her that if she returned to school, she would not have to pay for her education because she was a single black mother. Several days later, an anonymous caller, professing to be white, reported Wingo's conduct to a CSX ethics hotline. The caller stated that Wingo "takes delight in harassing employees of other races."

Williams also alleges that Wingo made two racist statements in passing to her between one to six months before the confrontation. Wingo once asked Williams why black people cannot name their children "stuff that people can pronounce, like John or Sue." He also told Williams that black people should "go back to where [they] came from." Notably, Williams does not allege that any of her coworkers or supervisors other than Wingo ever made a single sexist or racist remark.

Two months after the Wingo incident, on November 9, 2004, Williams lost her job at the Bruceton facility through multiple-step process. First, CSX eliminated the position of another one of the Bruceton clerks. That clerk then exercised his right under CSX policy to displace a more junior employee at the Bruceton facility, and that more junior employee in turn exercised his right to displace Williams — who had the shortest tenure of the four Bruceton clerks. After this occurred, Williams exercised her own displacement right to obtain a clerical position at CSX's Nashville facility, which is located approximately one hundred miles from Bruceton.

Williams's dislocation from Bruceton to Nashville precipitated the first of her two relevant administrative filings with the EEOC. In November 18, 2004, Williams filed a so-called "Charge Information Form" with the EEOC. In that filing, which spanned seven pages, Williams recounted the Wingo incident in detail. She alleged that the elimination of the other clerk's position, which led to her dislocation to the Nashville facility, was in retaliation against her for the anonymous call to the CSX ethics hotline reporting the Wingo incident. She also alleged, independently, that her dislocation to the Nashville facility was an act of discrimination based on her race and sex. She expressly stated that the Bruceton facility was "a very hostile work environment." Although Williams provided her signature at the bottom of the seventh page, she did not sign it under oath or penalty of perjury. Nothing on the "Charge Information Form" suggested a need to do so.

The EEOC office then completed for Williams a second filing, a so-called "Charge of Discrimination." In a single page, this filing attempted to lay out the essence of Williams's allegations. The general thrust was that discrimination and retaliation caused Williams's dislocation to the Nashville facility. The allegations mentioned neither Wingo's conduct nor any other indication of a hostile work environment; however, the second sentence stated that Williams was "subjected to unequal terms and conditions of [her] employment." Within a field entitled "discrimination based on," three boxes were marked: "race," "sex," and "retaliation." Within a field entitled "date(s) discrimination took place," the "earliest" date listed was September 2, 2004 (the

date of the Wingo incident). Immediately below, the box indicating that the discrimination was a "continuing action" was marked. Unlike the "Charge Information Form," this form prompted Williams to sign under a line stating that she "declare[d] under penalty of perjury that the above is true and correct." Williams signed the form, under penalty of perjury, on December 30, 2004.[1]

Williams sued CSX in federal district court for discrimination, retaliation, and both sexually and racially hostile work environments. The district court granted summary judgment to CSX on what appeared to be Williams's core claims: that her dislocation to the Nashville facility was the result of discrimination and retaliation. The district court found that Williams's dislocation was caused by an employee-consolidation effort emanating from CSX's corporate headquarters, not discrimination or retaliation. Williams does not appeal the disposition of those claims.

That left Williams's two hostile work environment claims. As to her claim of a *sexually* hostile work environment, the district court granted summary judgment to CSX on the theory that Williams failed to exhaust her administrative remedies: she did not file a "charge" containing sufficient allegations of a hostile work environment. As to her claim of a *racially* hostile work environment (which did not require exhaustion), the district court permitted Williams to proceed to trial. At the close of Williams's case in chief, however, the district court granted judgment as a matter of law to CSX. The district court believed that Williams's evidence of a racially hostile work environment was not sufficiently "severe or pervasive" to create a jury question on that claim. Williams now appeals the district court's judgments on her hostile work environment claims.

---

[1]The EEOC later completed for Williams a third filing, another "Charge of Discrimination," which alleged that CSX discriminated and retaliated against Williams by failing to promote her to the position of substitute yardmaster. Williams eventually sued CSX on a failure-to-promote claim, in addition to her other claims. The failure-to-promote claim went to trial, and the jury found in favor of CSX. Williams does not appeal the judgment on that claim.

## II.  Sexually Hostile Work Environment

Williams asserts her claim of a sexually hostile work environment under Title VII of the Civil Rights Act of 1964.  Before a plaintiff may sue under Title VII in federal court, she must first exhaust her administrative remedies, one component of which is timely filing a "charge" with the EEOC.  42 U.S.C. § 2000e-5(e), (f); *Younis v. Pinnacle Airlines, Inc.,* 610 F.3d 359, 362 (6th Cir. 2010).  Williams submitted two filings to the EEOC, but the district court held that neither of them were a "charge" for her claim of a sexually hostile work environment.  To determine whether the district court was correct, we must determine what a filing must contain in order to be a "charge."

Title VII does not define what constitutes a "charge."  *Edelman v. Lynchburg College*, 535 U.S. 106, 112 (2002).  The statute, however, does provide at least two necessary conditions for a filing to be a charge, and those requirements are fleshed out by interpreting regulations.  First, "[c]harges shall be in writing under oath or affirmation . . . ."  42 U.S.C. § 2000e-5(b).  The EEOC regulations interpret this statutory command as requiring charges to be "verified."  *See* 29 C.F.R. § 1601.9 ("A charge shall be in writing and signed and shall be verified."); 29 C.F.R. § 1601.3(a) (defining "verified" as "sworn to or affirmed" or "supported by an unsworn declaration in writing under penalty of perjury").  Second, "[c]harges . . . shall contain such information and be in such form as the [EEOC] requires."  42 U.S.C. § 2000e-5(b).  The EEOC, in turn, has promulgated a regulation that identifies five piece of information that a charge "should" contain:  (1)-(2) the names, addresses, and telephone numbers of the person making the charge and the charged entity; (3) a statement of facts describing the alleged discriminatory act; (4) the number of employees of the charged employer; and (5) a statement indicating whether the charging party has initiated state proceedings. 29 C.F.R. § 1601.12(a).  The next subsection, however, qualifies these requirements by stating that a written charge is "sufficient" if it is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of."  *Id.* § 1601.12(b).

A recent Supreme Court opinion added an "additional requirement" for an EEOC filing to constitute a charge. *See Federal Express Corp. v. Holowecki*, 552 U.S. 389, 398 (2008).**2** Acknowledging that more than half of the filings the EEOC receives each year are mere informational inquiries rather than enforcement requests, the Court reasoned that the statutory term "charge" implies that a filing must be the latter. *Id.* at 399-401. "[I]f a filing is to be deemed a charge," the Court held, "it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and employee." *Id.* at 402. Put differently, a filing is a charge if an "objective observer" would believe that the filing "taken as a whole" suggests that the filer "requests the agency to activate its machinery and remedial processes." *Id.* at 398, 402. "[U]nder this permissive standard a wide range of documents might be classified as charges," which is consistent with the principle that "pro se litigants are held to a lesser pleading standard than other parties." *Id.* at 402. In *Holowecki*, the plaintiff's "Intake Questionnaire" and accompanying six-page affidavit asked the EEOC to "[p]lease force Federal Express to end their age discrimination," so the Court held the filing was "properly construed as a request for the agency to act" and, therefore, a charge. *Id.* at 405.

To summarize, in order for an EEOC filing to constitute a "charge" that is necessary to exhaust an employee's administrative remedies under Title VII, the filing (1) must be "verified" — that is, submitted under oath or penalty of perjury, 29 C.F.R. § 1601.3(a); (2) must contain information that is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of," *id.* § 1601.12(b); and (3) must comply with *Holowecki* — that is, an "objective observer"

---

**2***Holowecki* interpreted the term "charge" as used in the Age Discrimination in Employment Act ("ADEA"), rather than in Title VII of the Civil Rights Act of 1964, and the Court began with a "cautionary preface" that lower courts should proceed with "careful and critical examination" before applying its interpretation to Title VII. 552 U.S. at 393. However, "numerous courts have applied *Holowecki* in the Title VII context because of the similarities between the statutory schemes of the ADEA and Title VII concerning exhaustion of administrative remedies." *Palmer v. Southwest Airlines Co.*, No. 08 C 6158, 2009 WL 3462043, at *5 n.3 (N.D. Ill. Oct. 23, 2009) (citing cases). Moreover, the regulation under the ADEA setting forth the information a filing must contain to be a charge is essentially identical to its counterpart regulation under Title VII. *Compare* 29 C.F.R. § 1626.8(a)-(b), *with* 29 C.F.R. § 1601.12(a)-(b). The parties here agree that *Holowecki* applies.

must believe that the filing "taken as a whole" suggests that the employee "requests the agency to activate its machinery and remedial processes," 552 U.S. 389, 398, 402.

### A. Williams's "Charge Information Form" Is a "Charge"

We conclude that Williams's first EEOC filing, the "Charge Information Form," is a charge for her claim of a sexually hostile work environment. *First*, although the district court was correct that this filing was not initially verified, the district court overlooked a pertinent federal regulation: "A charge may be amended to cure technical defects or omissions, including failure to verify the charge . . . ." 29 C.F.R. § 1601.12(b). The statute is silent on whether a filing may be amended to cure technical defects, and the EEOC's interpretation is reasonable under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Edelman v. Lynchburg College*, 535 U.S. 106, 110, 114 (2002) (giving *Chevron* deference to this same regulation). Williams signed her second EEOC filing, the "Charge of Discrimination" (discussed in more detail below), under penalty of perjury and, thus, verified it. For the technical purpose of verification, we conclude that Williams's second filing amended — and verified — her first filing. This result is only fair in light of the fact that nowhere did the "Charge Information Form" suggest that Williams needed to sign it under penalty of perjury, and Williams was proceeding pro se at the time.

*Second*, Williams's "Charge Information Form" contained information concerning a sexually hostile work environment that was "sufficiently precise to identify the parties, and to describe generally the action or practices complained of," 29 C.F.R. § 1601.12(b). Williams identified CSX and its employee, Jeff Wingo, as the offenders. In the course of three pages, she recounted the Wingo incident in detail: Wingo allegedly told her that "the problem with this country" was that single mothers "can't have the love of God in their hearts"; that women want equal rights "but aren't paying equally"; and that, as a black woman, Williams only had to submit an application to get a job.

*Third*, Williams's "Charge Information Form" satisfies the additional requirement of *Holowecki*: that an objective observer would believe that Williams

sought the EEOC to activate its remedial machinery, rather than simply obtain information. After recounting the details of her employment grievance, Williams expressly stated that the Bruceton facility was "a very hostile work environment" and that she "fe[lt] that [CSX] owe[d] [her] money damages." Like the plaintiff in *Holowecki*, who asked the EEOC to "[p]lease force [the employer] to end [its] age discrimination plan," 552 U.S. at 405, Williams's request for money damages was a request for the EEOC to act.

### B. Williams's "Charge of Discrimination" Is a "Charge"

We also conclude that Williams's second EEOC filing, the "Charge of Discrimination," is a charge for her claim of a sexually hostile work environment. *First*, Williams signed her name at the bottom of the filing in a signature block under a declaration that she "declare[d] under penalty of perjury that the above is true and correct." Thus, the filing was verified.

*Second*, Williams's "Charge of Discrimination" contained information concerning a sexually hostile work environment that is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of," 29 C.F.R. § 1601.12(b). The filing identified CSX, and specifically the Bruceton facility, as the alleged offender. Although the second filing is a single page and only contains three short paragraphs (apparently written by EEOC employees) about Williams's employment grievance, it sufficiently indicated a sexually hostile work environment. The box for "sex" was marked. Within the field entitled "date(s) discrimination took place," the "earliest" date listed was September 2, 2004 — the date when Wingo allegedly made the sexually hostile statements to Williams — and the box indicating that the discrimination was a "continuing action" was marked. These facts strongly suggest that the second filing complained not only of discrimination and retaliation in connection with the discrete incident of Williams's dislocation to the Nashville facility, but also of a continuing sexually hostile work environment that existed while Williams worked at the Bruceton facility. Our conclusion is bolstered by *Holowecki*'s instruction that pro

se EEOC filings, like Williams's filings in this case, are to be liberally construed. 552 U.S. 389, 402.

*Third*, Williams's "Charge of Discrimination" easily satisfies the additional requirement created in *Holowecki*. Unlike the "Intake Questionnaire" in *Holowecki*, everything about Williams's "Charge of Discrimination" suggests that Williams intended it to be a request for enforcement rather than an informational inquiry. CSX does not argue otherwise.

* * *

The district court erred in concluding that Williams had failed to file a charge of a sexually hostile work environment and, thus, had failed to exhaust her administrative remedies on this claim. Accordingly, we reverse the district court's grant of summary judgment to CSX on Williams's hostile work environment claim, and we remand for further proceedings.

## III. Racially Hostile Work Environment

Williams also appeals her racially hostile work environment claim, on which the district court granted CSX judgment as a matter of law after Williams's case in chief.[3] We review judgments as a matter of law de novo. *Scotts Co. v. Cent. Garden & Pet Co.*, 403 F.3d 781, 788 (6th Cir. 2005). "[A] court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151.

---

[3]Williams did not have to file a "charge" for this racial claim because she asserted it under 42 U.S.C. § 1981, which does not require the exhaustion of administrative remedies.

To succeed on a claim of a racially hostile work environment, a plaintiff must demonstrate that (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act. *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999).[4]  The parties agree that the first two elements are satisfied here; their dispute centers on the existence of a jury question on the third and fourth.

With respect to the fourth element, "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  When analyzing that element, we must consider harassment "by all perpetrators combined," rather than "divid[ing] and categoriz[ing] the reported incidents." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999).[5]  However, the third element limits the scope of this analysis:  only harassment *based on the plaintiff's race* may be considered. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000).  Accordingly, we will first determine what harassment was based on Williams's race, then we will ask whether the totality of that harassment was sufficiently severe or pervasive to create a jury question on her claim.

---

[4]This five-element test is usually posited for claims brought under Title VII, but we apply the same test to claims, as here, brought under § 1981. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("We review claims of alleged race discrimination brought under § 1981 . . . under the same standards as claims of race discrimination brought under Title VII . . . .").

[5]Although the *Williams* case dealt with a claim of a sexually hostile work environment rather than a racially hostile work environment, this Court may draw from cases involving a sexually hostile work environment. *See, e.g.*, *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("[T]he same principles that govern sexual harassment also govern claims of racial harassment.").

### A. Based on Race

A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998) (approving these methods in the analogous context of sexual harassment). Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist to qualify. *Clay v. United Parcel Serv., Inc.,* 501 F.3d 695, 706 (6th Cir. 2007).

Williams alleges, in essence, three categories of racial harassment: her supervisor Jeff Wingo's racist statements to her, the damage to her personal vehicle, and other adverse treatment at work. Wingo's racist statements are plainly based on race. Just as plainly, a reasonable jury could not find that the damage to Williams's personal vehicle was based on race. Williams has no direct evidence of racial causation. She did not witness the alleged vandalization, and she presented no evidence suggesting that CSX employees were the vandals, or even that the alleged vandalization happened while she was at work. Moreover, her comparative-evidence argument — that the vehicles of her white counterparts were not damaged — is weakened by the uncontroverted testimony of two of her coworkers that flat tires are common at the Bruceton facility.

A slightly closer question is whether a reasonable jury could find that the other adverse treatment Williams experienced at work was based on her race. Williams alleges that Ed Anderson, a supervisor, forced her to clean feces out of a urinal and off of a restroom wall; ordered her to strip a bathroom floor with an inappropriately small device and denied her request to rent a power tool; and refused to reimburse her for the mileage cost of driving her personal vehicle for work, even though corporate policy was to reimburse mileage and white employees received reimbursement.

Williams lacks any direct evidence that any of this adverse treatment was based on her race. None of it involved the use of racist language. Nor does Williams allege

that Anderson, the relevant supervisor in each instance, *ever* used racist language.  The mere fact that Wingo used such language does not imply that Anderson harbored the same prejudices.

Williams's comparative-evidence argument is also ultimately unpersuasive. Regarding her feces-cleaning assignment, Williams concedes that janitorial tasks fall within her job duties, and she presents no evidence that any of her white counterparts were available to clean the bathroom on that day.  As for her stripping the bathroom floor, Williams presents no evidence that Anderson ever permitted a white employee to rent a power tool to complete the task.  The fact that Tim Magargle, a different supervisor, once permitted a white employee to rent a power tool sheds no light on Anderson's motivations.  And as for the reimbursement of her mileage, Williams admitted that every time she submitted the appropriate expense form, CSX reimbursed her.  Accordingly, no reasonable jury could find that these other alleged instances of adverse treatment were based on Williams's race.  The only race-based instances of harassment are Wingo's racially derogatory statements.

## B.  Severe or Pervasive

We must next consider whether the totality of Williams's race-based harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.  Significantly, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Occasional offensive utterances do not rise to the level required to create a hostile work environment. *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008).  "To hold otherwise would risk changing

Title VII into a code of workplace civility, a result we have previously rejected." *Id.* (internal quotation marks omitted).

Although despicable, Wingo's alleged racist statements are not sufficiently "severe" or "pervasive" standing alone to create a jury question on Williams's racially hostile work environment claim. The statements were isolated, not pervasive: all but two occurred over a two-day period. Nor were they sufficiently "severe" for Williams to be able to prevail on a racially hostile work environment claim. Those statements — for example, calling Jesse Jackson and Al Sharpton "monkeys" and saying that black people should "go back to where [they] came from" — are certainly insensitive, ignorant, and bigoted. But they more closely resemble a "mere offensive utterance" than conduct that is "physically threatening or humiliating." *Harris*, 510 U.S. at 23. Accordingly, we affirm the district court's grant of judgment as a matter to law to CSX on this claim.

## IV. Admissibility of a Corporate Ethics Hotline Report

Finally, Williams appeals the district court's decision on a collateral evidentiary issue. As mentioned above, an anonymous caller phoned the CSX ethics hotline shortly after the Wingo incident. CSX generated a report of the call. According to that report, the caller said that Wingo insulted Williams and "the rest of the [b]lack race," that Wingo "takes delight in harassing employees of other races," and that "Wingo does not deserve to be in a managerial role if he cannot curb his excesses." The caller, who professed to being white, also reported that "[t]he morale of employees has been affected by this uncouth behavior."

Williams sought to introduce the report into evidence, but the district court held it to be inadmissible hearsay. Williams argues on appeal that the statements were not hearsay because she offered them to prove that CSX had notice of the harassment, rather than the truth of the matter asserted, *see* Fed. R. Evid. 801(c). The fatal flaw in Williams's argument is that whether CSX had notice of that incident is irrelevant for the only claim that was submitted to the jury: her failure-to-promote claim, which she does

not appeal. Although an employer's notice and inadequate response are necessary components of a hostile work environment claim, *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999), those issues are simply not part of the framework of a failure-to-promote claim, *see White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391-92 (6th Cir. 2008) (positing the four-part test for failure-to-promote claims). And Williams's racially hostile work environment claim fails for the reasons given in Part III above — that is, isolated racist remarks by a single supervisor are not "severe" or "pervasive" — irrespective of the contents of the CSX hotline report. Accordingly, the CSX hotline report was inadmissible hearsay, and the district court properly excluded it from evidence.

## V. Conclusion

For these reasons, we **REVERSE** the district court's grant of summary judgment to CSX on Williams's sexually hostile work environment claim, and we **AFFIRM** the district court's judgment as a matter of law to CSX on Williams's racially hostile work environment claim.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

ROGERS, Circuit Judge, concurring in part and dissenting in part.  I concur in Parts III and IV of the majority opinion but dissent from the reversal of the Title VII harassment claim.  The claim was not properly exhausted, for the reasons given by the district court.  Dist Ct. Order of Nov. 16, 2007, at 13-14.  The unverified Charge Information Form could be amended to meet the verification requirement, as the majority points out, but the later, verified Charge of Discrimination Form neither alleged a sexually hostile work environment, nor referred to the earlier form.

Allowing such unrelated documents to constitute a charge would permit employees, without fear of sanction, to force their employers to respond to potentially frivolous harassment claims, thereby undermining the statutory scheme.  As the Supreme Court explained in *Edelman v. Lynchburg College*, 535 U.S. 106, 112–13 (2002), the verification requirement seeks "[to] protect[] employers from the disruption and expense of responding to a claim unless a complainant is serious enough and sure enough to support it by oath subject to liability for perjury."

With respect, the verified Charge of Discrimination Form cannot be read to raise Williams's gender-based hostile-work-environment claim.  The only matter discussed in the form's three short paragraphs is Williams's forced job transfer, which she says followed a verbal altercation with the Yard Master (presumably Wingo).  Listing one specific action which Williams claims to be discriminatory does not assert a sexually hostile-work-environment claim.  Williams in fact brought separate discrimination and retaliation claims premised on the very scenario discussed in the Charge of Discrimination Form—her forced dislocation from CSX's Bruceton facility. The district court, however, granted CSX summary judgment on these claims, and Williams did not appeal the order.

The information contained in the "Date(s) Discrimination Took Place" box does not change the plain reading of the form's factual allegations. The "earliest" date of 9/2/2004 and the "latest" date of 11/9/2004 correspond to the verbal altercation with Wingo and to the date of Williams's forced dislocation, respectively. These two events, both of which are specifically mentioned in the form's factual allegations, are the basis for Williams's discrimination and retaliation claims. And checking a contiguous box for "continuing action" can hardly be read to give notice of a hostile-work-environment claim.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. I agree that Williams's gender-based hostile-work-environment claim was improperly dismissed before trial for failure to exhaust administrative remedies.

As to Williams's race-based hostile-work-environment claim, I do not agree with my colleagues' affirmance of the district court's grant of judgment as a matter of law and therefore respectfully dissent.

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Hawkins v. Anheuser-Busch Inc.*, 517 F.3d 321, 332-33 (6th Cir. 2008) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986)). To prove harassment, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999) (quoting *Harris*, 510 U.S. at 21-22). This evaluation of the work environment "must take into account the totality of the circumstances. '[E]ven where individual instances of . . . harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation.'" *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 273 (6th Cir. 2009) (quoting *Williams*, 187 F.3d at 563).

The district court acknowledged that it had to look to the totality of the circumstances in evaluating CSX's motion for judgment as a matter of law on Williams's race-based hostile environment claim . But its ruling from the bench suggests that it separated the conduct that was not overtly race-based (e.g., making Williams clean feces from the bathroom walls on several occasions, and urine all over the bathroom on a continual basis) from Wingo's blatantly race-based comments,[1] rather than looking to, as the Supreme Court held in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998), "the critical issue" per Title VII's text – "whether members of one [race] are exposed to disadvantageous terms or conditions of employment to which members of the other [race] are not exposed." *Id.* (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)).

Substantial trial testimony supported that Williams was exposed to disadvantageous conditions of employment to which white clerks were not exposed. For example, Railroad Engineer Melvin Brack testified that he had worked for CSX for 34 years, and had been at the Bruceton depot approximately one to four times a week for the last 12 years, since 1997. Brack testified that after arriving at Bruceton, he would put his train away and go to the depot (where Williams worked) to register as off-duty and wait for a ride to a hotel, i.e., that he would "camp out" at the depot. Brack testified that typically two employees were working at the Bruceton depot, a yardmaster and a clerk. He described the depot as having three offices in the upstairs, and the downstairs as having a general locker room, sitting area for the crews and a bathroom. Brack testified:

---

[1]After hearing argument from counsel and discussing the evidence, the district court ended by saying:

> Again, the court simply finds that the conduct by Mr. Wingo, as reprehensible as it might have been, was not a continuing type of conduct, as I determine. I recognize that there were some other instances that occurred, according to the plaintiff, but I simply do not find as a matter of law that these constituted a hostile work environment. I simply don't believe, based upon what I have heard from the testimony presented, that it constituted that. . . .

Trial Tr. 4/2/09 at 802.

BY MR. GILBERT:

Q    Mr. Brack . . . We were talking about the bathroom conditions, and I want to ask you some questions now about once Ms. Williams was hired; okay? In other words, once she is in place as a clerk . . . . Did you have the opportunity to observe the general conditions of the bathroom once she was hired?

A    Yes, I did.

Q    Would you describe that for the jury, please.

A    The bathrooms had always been somewhat –

     MS. GALLAGHER: Objection, Your Honor.

BY MR. GILBERT:

Q    If you would, instead of going back, let's stick with what you observed once Ms. Williams was there; okay?

A    The bathrooms after Ms. Williams was there became filthy, completely unusable. There was feces placed on the wall, over the urinals, over the commode, on the floor, on the sinks. I personally helped Ms. Williams clean the area because it was so gross. I didn't think it was right for her to have to be given those responsibilities to do.

     . . . .

Q    Let me ask you some questions about this urine. And I'm not trying to be funny here, but what if someone said it was just bad aim, someone just missed the urinal or just missed the toilets?

A    Impossible.

Q    Why?

A    Because of the magnitude, where it was. There's a difference between just normal use of someone with perhaps an upset stomach for the use of the commode versus all on the wall, on the side of it, on the sink and on the walls and floor.

Q    How many times would you say you saw urine on the walls, sinks or floors, the urine?

A    The urine was regularly.

Q    And what does regularly mean in terms of --

A    Meaning daily.  The times when I was there, most of the – most times the urine was on the floor.  And, again, impossible that someone could accidentally do such an act.

MR. GILBERT:  I pass the witness, Your Honor.

### CROSS-EXAMINATION

BY MS. GALLAGHER:

. . . .

Q    And I understand that it's your testimony that on more than one occasion you saw the restroom in this condition; is that correct?

A    Correct.

Q    You never filed a grievance with your union to complain about this restroom.

A    You must remember, in 34 years of railroad experience, I've seen the bathrooms in the worst deteriorated conditions over the 34 years where the railroad did not care about a bathroom.  I've seen them go weeks and weeks without having been cleaned.  So because of the length of time, it was acceptable – I assume the railroad thought it was acceptable.  *But to a point where there was feces and urine on the walls and everything, that was just too much.*

[Emphasis added.]  Craig Spangler testified that he had been a CSX conductor since 1998 and had worked with Williams at the Bruceton depot.  Spangler testified that when Williams was working the bathrooms were clean and the trash taken out, and when she was not working "Trash would be laying around on the tables.  Garbage cans would be full.  A couple of times I've walked in the bathroom and you could tell that somebody had used the floor instead of using the commode."  When asked if he thought that was an accident, he responded "It looked like it was intentional.  I mean you can tell when somebody misses."

Williams testified that the urinating all over the bathroom happened on a continual basis, and that she was required to clean feces in the Bruceton depot downstairs bathroom on two occasions, which she described:

> Q     Ms. Williams . . . Was there any time when you were required to clean up feces?
>
> A     I had come to work one day, and someone had decided that they were going to do in the urinal what needed to be done in the toilet, and it was feces all in the urinal there in the bathroom, and I had to clean that up that day.
> I reported that to Mr. Anderson, and his response was, "Well, you know we work with immature people. You just need to get it cleaned up."
> . . . .
> Q     Was there a separate occasion other than the time that the feces was in the urinal that you had to clean up?
>
> A     Yes.
> . . . .
> That occasion, a trainman by the name of Mr. Brack happened to be on duty there at Bruceton, and he saw the condition of the bathroom, what it was in, and he went – he told me that he was going to help me clean it . . .
> . . . .
> There was feces spread around the wall, smeared over the wall. It was coming down the toilet, the outside of the toilet. It was on the floor.

In *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 466 (6th Cir. 2009) (applying Michigan law), the defendant-employer appealed the district court's denial of its motion for judgment as a matter of law following a jury verdict in favor of three of the plaintiffs on their race-based hostile-work-environment claims. The defendant-employer in *Betts* argued on appeal that the harassment was not sufficiently severe or pervasive to constitute a hostile work environment, *id.* at 466-67, just as CSX successfully argued below in the instant case. Addressing whether the evidence was sufficient for the jury to find in favor of the three plaintiffs on their hostile-work-environment claims, this court stated:

Costco's lack-of-severity argument takes a divide-and-conquer approach to the employees' allegations.  In other words, Costco insists that the individual allegations of [the three plaintiffs, Amour, Lewis, and Betts] must be examined in isolation in order to accurately assess the merits of each employee's claim.  But Costco's approach is inconsistent with the totality-of-the circumstances test employed to determine whether there is a hostile work environment.  Under this test, "the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether – taken together – the reported incidents make out such a case." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999).  Indeed, "[t]his court's caselaw therefore makes clear that the factfinder may consider similar acts of harassment of which a plaintiff becomes aware during the course of his or her employment, even if the harassing acts were directed at others or occurred outside of the plaintiff's presence." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 336 (6th Cir. 2008).

. . . .

Two conflicting scenarios regarding the racial atmosphere at Costco's Warehouse 390 emerge from the record.  Under the first scenario, [Warehouse 390 Manager Phil] Sullivan's tendency to make racially insensitive remarks is indicative of poor taste and a bad sense of humor, but the remarks were not intended to create, nor in fact created, a hostile atmosphere for black employees.  The incidents that the employees identified are few and far between:  Amour's claim is based on nothing more than the six comments or actions set forth in Part II.A. above[2] over a seven-month period.  Lewis, in turn, testified to only the

---

[2]This court summarized:

Sullivan told Amour that he felt like he was working on a "plantation," which alluded to Costco's numerous black employees.

Darrin Schaeffer, a white supervisor at the Warehouse, called Amour "Phil's Boy," "Phil's Bitch," and "Phil's Houseboy."

Amour heard Sullivan say to white supervisors at the Warehouse that he (Sullivan) "wanted them to hire more white women with big breasts."

Sullivan would treat white customers better than black ones.

A white employee, Ann McCormick, had exactly the same number of employment infractions as another black employee who was reprimanded, but nothing was done to McCormick.

Sullivan moved white employees to Front-End Cashier positions and relegated black employees to less desirable floor positions shortly after making the "plantation" comment.

*Betts*, 558 F.3d at 464-65.

four points listed in Part II.A. above.[**3**]  And Thomas's claim was based on only two remarks [Thomas witnessed Sullivan berate Betts, another black employee, to the point of tears, after which Sullivan said, "that girl gets under my skin;" Thomas went to a supervisor to discuss a comment Sullivan made about "hiring more white people;" Sullivan's behavior made Thomas want to move from her position in the store; and the environment once Sullivan arrived at the warehouse was like "walking on egg shells."]  *See, e.g., Clay v. United Parcel Serv.*, 501 F.3d 695, 707-08 (6th Cir. 2007) (holding that 15 incidents over a two-year time frame did not constitute severe or pervasive conduct).  Thomas's claim is further undermined by her admission that she herself did not feel harassed.  Indeed, there are even fewer statements relevant to determining whether there was a racially hostile work environment because several of the allegations are not inherently racial, such as Sullivan's comments that Betts "gets under [his] skin."  Under this view, a reasonable jury could find that Sullivan's conduct did not "interfere substantially with the employee's employment or create an intimidating, hostile, or offensive work environment."  *See Downey* [*v. Charlevoix Cnty. Bd. of Rd. Comm'rs*, 576 N.W.2d 712, 716 (1998).]

But there is a second scenario that also fits the facts.  Several black employees voiced similar complaints about Sullivan's systematic racial bias.  Sullivan compared Warehouse 390 to a plantation on two separate occasions.  These comments reveal Sullivan's managerial philosophy with respect to his black employees:  they were second-class citizens and would be treated accordingly.  Indeed, Sullivan called one employee "so black and ugly he would never have her work up front," which expresses the belief that one's value as a cashier depends in part on the employee's skin color.  Sullivan also chastised black employees but withheld criticism from white employees whose conduct was essentially the same, and moved white employees to front-end positions while relegating black employees to less desirable floor positions.  He also wanted to hire more white women, implying that there were too

---

[**3**]Pertaining to Lewis, *Betts* states:

Lewis overheard Sullivan say that he thought he was working on a plantation.

Sullivan called Betts a "black-widow spider."  Lewis heard the comment and believed that it was racist because there was no reason to call her "black," as opposed to simply calling her a spider.

Sullivan called Betts "so black and ugly he would never have her work up front." (Lewis equivocated about whether she heard the comment first hand or learned about it from a coworker.)

*Betts*, 558 F.3d at 465.

many black women at Costco. If indeed Sullivan wanted more white employees, one could reasonably infer that creating a hostile atmosphere for black employees to increase their turnover rate would serve this end. Even Sullivan conceded that two Costco employees thought that he was a racist, and one of Sullivan's superiors, Vice President Webb, had personally heard Sullivan make a racially inappropriate remark about watermelons.

Sullivan's position as the Warehouse Manager is also a relevant consideration. He was not simply a low-level supervisor with little impact on the broader workplace. As the Warehouse Manager, Sullivan set the tone at the top. Indeed, his racially charged attitude apparently caught on: at least one other white Costco supervisor, Schaeffer, denigrated Amour in racially loaded terms, calling him "Phil's Boy," "Phil's Bitch," and "Phil's Houseboy." The racial hostility was further evidenced not only by Sullivan's treatment of Costco's employees, but also by his less-than-favorable treatment of its black customers.

How one sorts out these two competing racial scenarios at Warehouse 390 is not obvious, as evidenced by the deadlock of the first jury. Certain facts make the employees' claims questionable. The fact that Sullivan socialized with Amour, that Amour was offered a managerial position by Sullivan, and that Thomas conceded she was not harassed lean in favor of Costco. On the other hand, none of these considerations foreclose the possibility that Sullivan "*in fact . . .* created an intimidating, hostile, or offensive work environment." *See Downey*, 576 N.W.2d at 716 (emphasis added).

*Betts*, 558 F.3d at 468-70. Granted, *Betts* amalgamates the evidence from each of the plaintiffs to arrive at the determination that there was sufficient evidence to go to the jury on the race-based hostile environment claim. But Williams's evidence in the instant case is at least comparable to the plaintiffs' in *Betts* in terms of severity, and the cases are similar in that the challenged comments were few.

As in *Betts*, in the instant case, under the totality-of-the circumstances test, there are also two conflicting scenarios. The first is that Wingo, with whom Williams had worked for approximately 2 1/2 years largely without incident, made inappropriate remarks at the Bruceton depot on September 2, 2004, and that a lively discussion ensued that continued the following day. Apart from that, Wingo made several remarks over the 2 1/2 years, i.e., that Williams reminded him of Queen Latifah, that black persons should

give their children easily-pronounced names, and that if Williams felt that black persons were treated so badly, they needed to go back to where they came from.

The second scenario is that Williams, the only black employee working at the Bruceton depot had the same janitorial duties as her white-clerk counterparts but, unlike them, was made to clean human feces off the bathroom walls on several occasions, and to clean on a continual basis urine outside the urinal and sink, leading one trial witness to remark that in his 34 years at CSX he had never seen such conditions. When Williams raised the bathroom conditions to a supervisor, she was told that "you know we work with immature people." Craig Spangler, another CSX employee that worked with Williams at the Bruceton depot, testified that when Williams was working the bathrooms were clean and the trash taken out, and when she was not working "Trash would be laying around on the tables. Garbage cans would be full. A couple of times I've walked in the bathroom and you could tell that somebody had used the floor instead of using the commode."

A reasonable fact-finder could thus have inferred that Williams's white counterparts were not made to fulfill their janitorial duties, while she was, regardless of how extreme and unsanitary the conditions were. Under *Oncale*, the jury was permitted to infer from this evidence that Williams was treated differently than her white counterparts because of her race. This inference, in conjunction with the evidence of Wingo's blatantly race-based comments on September 2d and 3d, 2004, and on other occasions, rendered the district court's grant of judgment as a matter of law improper. The claim should have been submitted to the jury.

I would reverse the district court's grant of judgment as a matter of law to CSX on Williams's race-based hostile-work-environment claim and remand for further proceedings.